UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANDREW TOWER,

    Plaintiff,

    v.

UNITED STATES CUSTOMS AND
BORDER PROTECTION,

    Defendant.

Civil Action No. 23-204 (JDB)

## MEMORANDUM OPINION

Plaintiff Andrew Tower filed this suit to compel U.S. Customs and Border Protection ("CBP") to comply with a records request made under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Tower, a CBP officer and a former union member, seeks records related to CBP's and his union's actions after Tower resigned his union membership. Before the Court are the parties' cross-motions for summary judgment. Principally at issue is the propriety of CBP's so-called Glomar response, in which it refused to confirm or deny the existence of the requested records. Because the Court concludes that the Glomar response was inappropriate, it will deny CBP's motion, grant in part and deny in part Tower's motion, and direct CBP to search for and process the requested records in line with standard FOIA procedures.

### Background

Tower became a CBP officer in August 2019. Decl. of Officer Andrew Tower [ECF No. 28-2] ("Tower Decl.") ¶ 2; see Tower's Statement of Undisputed Material Facts [ECF No. 28-4] ("Tower SUMF") ¶ 1; Def.'s Resp. to Pl. SUMF [ECF No. 30-1] ("CBP Resp.") ¶ 1. He also became a member of the National Treasury Employees Union ("NTEU") and authorized CBP to

1

begin deducting union dues from his pay. Tower SUMF ¶ 1; CBP Resp. ¶ 1. In September 2021, Tower resigned his NTEU membership and deauthorized dues deductions. Tower SUMF ¶ 2; CBP Resp. ¶ 2. Tower alleges that NTEU converted him to a "member not in good standing" on February 11, 2022. Tower SUMF ¶ 3. He alleges that this status change triggered a duty on the part of NTEU to promptly inform CBP that he was no longer a member in good standing, and a corresponding duty on the part of CBP to cease deducting union dues from his pay. Id. ¶¶ 5–6. But, he says, neither NTEU nor CBP initially notified him of the status change, and CBP continued deducting union dues from his wages for more than six months after he became a "member not in good standing." Id. ¶¶ 4, 7. Eventually, Tower became aware of the situation and sought to learn why he had been converted to a "member not in good standing," how NTEU and CBP generally respond to such a status change, and why CBP had continued deducting dues from his wages, among other issues. Id. ¶ 8. He says he discussed these questions with Robert Holland, a fellow CBP officer and the President of NTEU Chapter 173. Id. Tower understood Holland to have been involved in changing Tower's union membership status. Id. ¶ 10; see Tower Decl. ¶¶ 5, 7.[1]

On November 7, 2022, Tower submitted a records request to CBP pursuant to FOIA and the Privacy Act. Ex. 1 to Tower Decl. ("FOIA Req.") at 1; see also Tower SUMF ¶ 9; CBP Resp. ¶ 9. He requested

> a copy of documents containing information related to U.S. Customs and Border Protection Officer / NTEU Chapter 173 President Robert Holland's communication sent and/or received between the dates of 11 February 2022 and present date containing any variations of the following contents, names, or terms: Andrew Tower, Tower, CBPO Tower, Officer Tower, Member not in good standing, member not in good standing, Members not in good standing, members not in good

---

[1] CBP levies a series of questionable objections to this portion of Tower's statement of facts. See Def. Resp. ¶¶ 3–8. This material is largely contextual, but also bears on the "public interest" analysis discussed below. As to that analysis, CBP credits Tower's assertions about the nature of his concerns, see Def.'s Combined Reply in Further Supp. of Mot. for Summ. J. & Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J. [ECF No. 30] at 8 (citing Tower Decl.), so the Court will do the same.

2

standing, good standing.

FOIA Req. at 1.  CBP did not respond to this request within twenty business days.  Tower SUMF ¶ 11; CBP Resp. ¶ 11; see 5 U.S.C. § 552(a)(6)(A); 6 C.F.R. § 5.23(c).

On January 25, 2023, Tower filed the present suit.  See Compl. [ECF No. 1].  His initial complaint alleged that CBP had violated FOIA and the Privacy Act by not timely responding to his records request.  See id. ¶¶ 28–42.

On March 1, 2023, CBP responded to Tower's FOIA request.  Ex. B to Def.'s Mot. for Summ. J. [ECF No. 25-4] ("FOIA Resp.") at 1.  CBP declined to produce any records.  Id.  The response stated, in relevant part:

> CBP has considered the foreseeable harm standard when reviewing the record set and has applied the FOIA exemptions as required by the statute and the Attorney General's guidance.  Any records that may be responsive would be withheld in full pursuant to Title 5 U.S.C. § 552 (b)(6) and (b)(7)(C).  Additionally, you requested emails from an outside entity and CBP is unable to search for emails outside the government network.
>
> **FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy.  This requires a balancing of the public's right to disclosure against the individual's right to privacy.  [The types of documents and/or information that we have withheld may consist of birth certificates, naturalization certificates, driver's license, social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal.]  The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information.  Any private interest you may have in that information does not factor into the aforementioned balancing test.
>
> **Exemption 7(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy.  This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity.  That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation.  Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical

> withholding of information that identifies third parties in law enforcement records is ordinarily appropriate.

Id. at 1–2 (footnote omitted).  The response did not address Tower's Privacy Act request.  See id.

Tower then filed a supplemental complaint, challenging CBP's response and asserting further FOIA and Privacy Act claims.  See Suppl. Compl. [ECF No. 10] ¶¶ 22–45.  CBP answered the complaint and supplemental complaint.  See Answer [ECF No. 13].

CBP moved for summary judgment, see Def.'s Mot. for Summ. J. [ECF No. 25] ("Mot."), Tower filed a cross-motion and opposition, see Pl.'s Cross-Mot. for Summ. J. [ECF No. 28]; Pl.'s Mem. of Law in Opp'n to Mot. and in Supp. of Pl.'s Cross-Mot. for Summ J. [ECF No. 28-1] ("Cross-Mot. & Opp'n"), CBP filed an opposition and reply, see Def.'s Combined Reply in Further Supp. of Mot. for Summ. J. & Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J. [ECF No. 30] ("CBP Opp'n & Reply"), and Tower filed a reply, see Pl.'s Reply in Supp. of Cross-Mot. for Summ. J. [ECF No. 33] ("Tower Reply").  On the same day that CBP filed its motion for summary judgment, it sent Tower a letter acknowledging that its prior response "did not specifically address [his] Privacy Act request" and "clarify[ing]" that it had also considered this request and determined that Tower was not entitled to the requested records under the Privacy Act.  Ex. C. to Mot. [ECF No. 25-5].  Tower subsequently withdrew his substantive Privacy Act claim, see Cross-Mot. & Opp'n at 2, 14, leaving his FOIA claims as the focus of the parties' dispute.  The parties principally clash over the propriety of CBP's purported "Glomar response" to Tower's request.  The cross-motions are now fully briefed and ripe for resolution.

**Legal Standard**

"[T]he basic purpose of the Freedom of Information Act [is] to open agency action to the light of public scrutiny, and thereby further the citizens' right to be informed about what their government is up to."  Bartko v. U.S. Dep't of Just., 898 F.3d 51, 66 (D.C. Cir. 2018) (internal

4

quotation marks omitted). The statute "implements a general philosophy of full agency disclosure." People for the Ethical Treatment of Animals v. Nat'l Insts. of Health, Dep't of Health & Hum. Servs. ("PETA"), 745 F.3d 535, 540 (D.C. Cir. 2014) (cleaned up). It requires federal agencies, "upon any request" that "reasonably describes" the requested records and meets certain procedural requirements, to "make the records promptly available." 5 U.S.C. § 552(a)(3)(A). "An agency can withhold or redact documents only if the information falls within one of nine statutory exemptions." PETA, 745 F.3d at 540 (citing 5 U.S.C. § 552(b)(1)–(9)). The agency bears the burden of establishing that one or more of these exemptions apply. See id.

Normally, to rely on a FOIA exemption the agency must "acknowledge the existence of information responsive to [the] FOIA request and provide specific, non-conclusory justifications for withholding that information." Knight First Amend. Inst. at Columbia Univ. v. CIA, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting Roth v. DOJ, 642 F.3d 1161, 1178 (D.C. Cir. 2011)). But in some cases, "merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'" PETA, 745 F.3d at 540 (quoting Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007)). In such cases, the agency may issue a so-called Glomar response that refuses to confirm or deny the existence of the requested records. See id.[2] A Glomar response "is valid 'if the fact of the existence or nonexistence of agency records [itself] falls within a FOIA exemption.'" Id. (quoting Wolf, 473 F.3d at 374). The agency "bears the burden to sustain a Glomar response," and the "general exemption review standards established in non-Glomar cases" govern the inquiry. Knight First Amend. Inst., 11 F.4th at 813 (internal quotation marks omitted).

---

[2] The Glomar response "takes its name from the CIA's refusal to confirm or deny the existence of records about the Hughes Glomar Explorer, a ship used in a classified CIA project to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts." PETA, 745 F.3d at 540 (cleaned up); see generally Phillippi v. CIA, 655 F.2d 1325 (D.C. Cir. 1981).

A valid Glomar response relieves the agency of the duty to search for responsive documents. PETA, 745 F.3d at 540.

Courts may grant summary judgment to the agency "based on agency affidavits explaining the basis for the [Glomar] response." Id. Such affidavits "must contain 'reasonable specificity of detail rather than merely conclusory statements' and cannot be 'called into question by contradictory evidence in the record.'" Id. (quoting Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency, 678 F.3d 926, 931 (D.C. Cir. 2012)).

## Analysis

### I. Glomar Response

CBP maintains that it issued a proper Glomar response based on FOIA Exemption 6. See Mot. at 1.[3] Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). CBP argues that lower-level CBP employees, by virtue of their government employment and CBP's law enforcement mission, have a significant privacy interest in preventing the public disclosure of their identities. See Mot. at 7–8. Because Tower requested documents "related to [CBP] Officer / NTEU Chapter 173 President Robert Holland's communication[s]," CBP contends that acknowledging the existence of any such documents would necessarily confirm that Holland is indeed a CBP officer. Id. at 10. Thus, CBP reasons, such an acknowledgement falls within Exemption 6 and a Glomar response was appropriate.

Tower challenges CBP's position on two grounds. First, he argues that CBP did not in fact invoke Glomar because CBP's response confirmed the existence of responsive documents. See Cross-Mot. & Opp'n at 8–10. Second, he contends that any Glomar response would fail because

---

[3] CBP's initial response to Tower's records request invoked both Exemption 6 and Exemption 7(C), but CBP now relies solely on the former. See FOIA Resp. at 1–2; Mot. at 3 n.4.

6

the widespread public disclosure of Holland's status as a CBP officer undermines any privacy interest in that fact. See id. at 10–13. The Court considers these arguments in turn.

### A. Invocation

Tower first contends that CBP's response to his records request was not a proper Glomar response. He points to language that can be read to suggest that CBP conducted a search and acknowledged the existence of responsive documents: CBP "considered the foreseeable harm standard when reviewing the record set" and, in relation to Exemption 6, referred to "[t]he types of documents and/or information that we have withheld." FOIA Resp. at 1 (emphases added). Thus, Tower says, CBP's response was not a Glomar response but rather a "categorical denial," to which different standards may apply. See Cross-Mot. & Opp'n at 8–10, 13–14. CBP counters that—in context—"reviewing the record set" simply means considering the type of records sought by Tower to determine whether an exemption applied. CBP Opp'n & Reply at 10. CBP further contends that it never confirmed the existence of any responsive documents and that its response that "[a]ny records that may be responsive would be withheld in full" illustrates as much. FOIA Resp. at 1 (emphasis added); see CBP Opp'n & Reply at 10. And CBP argues that it has "consistently maintained that it did not conduct a search," see CBP Opp'n & Reply at 10—a representation with which Tower appears to agree, see Suppl. Compl. ¶¶ 3, 15.

CBP's response is not a model of clarity, and both parties' readings are plausible. Because the Court concludes that any Glomar response would be unavailing, it will assume—favorably to CBP—that the agency's response was in fact a Glomar response.

### B. Propriety

CBP's Glomar response is valid if the fact of the existence or nonexistence of records itself falls within Exemption 6. See PETA, 745 F.3d at 540. Again, Exemption 6 applies to "personnel

7

and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The primary purpose of this exemption is to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." Prison Legal News v. Samuels, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (internal quotation marks omitted).

To assess an agency's invocation of Exemption 6, courts first consider whether the requested information is "personnel, medical, or similar files covered by [the exemption]." Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev. ("AILA"), 830 F.3d 667, 673 (D.C. Cir. 2016) (internal quotation marks omitted). If so, courts then determine whether disclosure of the information at issue "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); see also AILA, 830 F.3d at 673. This determination involves two steps. Courts first ask whether "disclosure would compromise a substantial, as opposed to a de minimis, privacy interest." AILA, 830 F.3d at 674 (internal quotation marks omitted). If that requirement is met, courts then "weigh the privacy interest at stake against the public interest in the release of the records." Id. at 674 (internal quotation marks omitted). "The focus of the public interest analysis is the citizens' right to know what their government is up to." Prison Legal News, 787 F.3d at 1147 (internal quotation marks omitted). "Neither the identity of the requesting party nor the purpose for which the party intends to use a document is relevant" to this analysis. Id.

The threshold requirement is not at issue here, as Tower does not dispute that names can be "similar files" within the meaning of Exemption 6. See Cross-Mot. & Opp'n at 10–13; see also Prison Legal News, 787 F.3d at 1147 ("Exemption 6 covers not just files, but also bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." (cleaned up)). Nor does Tower meaningfully dispute that lower-level CBP officers have

8

some degree of privacy interest in their names. See Cross-Mot. & Opp'n at 13 n.17 (expressing doubt on this point but noting that the issue is "not squarely presented here").[4] Rather, Tower argues that any privacy interest Holland may have in his identity as a CBP officer is significantly diminished by Holland's widespread public disclosure of that very fact. See id. at 10–13. Tower points to a variety of public materials identifying Holland as a CBP officer, including:

- A public NTEU bulletin discussing COVID-19 vaccination that cites remarks by Holland and identifies him as a CBP officer and NTEU Chapter 173 President. Ex. 1 to Decl. of David R. Dorey [ECF No. 28-3] ("Dorey Decl.") at 4.

- A message from Holland on NTEU's public website that identifies him as NTEU Chapter 173 President and indicates an association with "Chapter 173 | CBP Detroit." Ex. 2 to Dorey Decl. at 1–2.

- A blog post on NTEU's public website discussing Holland's contact with members regarding their "NTEU-CBP contract." Ex. 3 to Dorey Decl. at 1.

- Another public NTEU bulletin that identifies Holland, of "Chapter 173, CBP Detroit" as the recipient of an award for exemplary union leadership. Ex. 4 to Dorey Decl. at 3.

- A press release from the leadership of the Senate Homeland Security and Governmental Affairs Committee that quotes Holland, in his capacity as President of NTEU Local 173, discussing CBP staffing shortages. Ex. 5 to Dorey Decl. at 3.

- A page on NTEU's website with nineteen videos of Holland discussing various topics relevant to Local 173 members. Ex. 6 to Dorey Decl. at 1–3; see 173TV, NTEU Chapter 173, http://www.nteu173.com/173-tv.html [https://perma.cc/52GN-TPCJ].

- A post on the "NTEU Chapter 173 CBP Detroit" public Facebook page identifying Holland in his CBP uniform. Ex. 2 to Tower Decl. at 1.

---

[4] While this inquiry is context-specific, at least two judges in this District have concluded that CBP officers have privacy interests in their identities. See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs, 405 F. Supp. 3d 127, 143–44 (D.D.C. 2019); Sabra v. U.S. Customs & Border Prot., Civ. A. No. 20-681 (CKK), 2023 WL 1398473, at *8 (D.D.C. Jan. 31, 2023).

The Court agrees that these affirmative public disclosures significantly diminish any privacy interest on the part of Holland in his identity as a CBP officer. That conclusion is firmly grounded in D.C. Circuit precedent. Consider Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice, 746 F.3d 1082 (D.C. Cir. 2014). That case involved a FOIA request seeking files related to the FBI's purported investigation of Tom DeLay—the former Majority Leader of the House of Representatives—in relation to a public corruption scandal. Id. at 1087. The D.C. Circuit considered, inter alia, the applicability of Exemption 7(C), which relates to law enforcement records and provides greater privacy protection than Exemption 6. See id. at 1091–96, 1091 n.2. The court reasoned:

> In August 2010, DeLay made public statements confirming the fact that he had been, but was no longer, under investigation. He explained the extent of his cooperation with the investigation and announced the DOJ had decided not to charge him. DeLay's obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation was diminished by his well-publicized announcement of that very fact. Because DeLay's public statements confirmed he had been under investigation, the FBI's acknowledgment that it had responsive records would not itself cause harm by confirming that fact, rendering a Glomar response inappropriate.

Id. at 1091–92 (citations omitted).

Other cases in this circuit reflect similar logic. See Kimberlin v. DOJ, 139 F.3d 944, 949 (D.C. Cir. 1998) ("[A disciplined AUSA's] statement to the press undoubtedly does diminish his interest in privacy [for purposes of Exemption 7(C)]: the public already knows who he is, what he was accused of, and that he received a relatively mild sanction."); Nation Mag., Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995) ("[Ross] Perot's decision to bring information connecting himself with such efforts into the public domain differentiates his privacy interest from the interest of [those] who did not voluntarily divulge their identities; these public disclosures effectively waive Perot's right [under Exemption 7(C)] to redaction of his name

from documents on events that he has publicly discussed."); see also, e.g., Woodward v. U.S. Marshals Serv., Civ. A. No. 18-1249 (RC), 2022 WL 296171, at *3 (D.D.C. Feb. 1, 2022); Lindsey v. FBI, 271 F. Supp. 3d 1, 8 (D.D.C. 2017).

Here, Holland appears to be a vocal, public advocate for the CBP officers in his local union chapter. His public presence extends across a variety of media, even including a feature in a U.S. Senate press release. All of that is to be commended. But these affirmative public disclosures of Holland's identity as a CBP officer seriously undermine CBP's contention that Holland has a meaningful privacy interest in that very fact.

CBP resists this conclusion. CBP insists that rather than challenging the applicability of Exemption 6 on the merits, Tower is (unsuccessfully) invoking the "official acknowledgment" doctrine, under which a plaintiff "must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has been made public through an official and documented disclosure [by the agency itself]." Knight First Amend. Inst., 11 F.4th at 815 (internal quotation marks omitted); see id. at 816; CBP Opp'n & Reply at 3, 14–16. The Court disagrees. Tower's challenge is squarely directed at the weight of Holland's privacy interest for purposes of the Exemption 6 analysis. See Cross-Mot. & Opp'n at 10–13; Tower Reply at 6 & n.5. And the official acknowledgement doctrine operates to waive an agency's right to withhold "otherwise exempt information." Knight First Amend. Inst., 11 F.4th at 813 (emphasis added and internal quotation marks omitted); see also, e.g., Wolf, 473 F.3d at 378 ("[W]hen information has been officially acknowledged, its disclosure may be compelled even over an agency's otherwise valid exemption claim." (emphasis added and internal quotation marks omitted)). That is to say, the official acknowledgement doctrine generally represents a mechanism for overcoming the normal exemption analysis to plaintiffs' benefit—not supplanting it to plaintiffs' detriment.

The Court acknowledges that the case law does not always clearly distinguish between the official acknowledgement doctrine, the related "public domain" doctrine, see, e.g., Cottone v. Reno, 193 F.3d 550, 555–56 (D.C. Cir. 1999), and the personal public disclosure doctrine discussed above.  But while there may be borderline cases, this is not one of them.  Holland's repeated public disclosure of his identity as a CBP officer falls squarely within the third line of D.C. Circuit precedent.  And the affirmative nature and extent of the public disclosure here significantly diminishes any associated privacy right.  Cf. U.S. Dep't of Def. v. Fed. Lab. Rels. Auth., 510 U.S. 487, 500 (1994) (noting that the mere fact that information "may be available to the public in some form" does not necessarily "dissolve" a privacy right).

Tower maintains that the Exemption 6 analysis should end there.  He asserts that, given the weak privacy interest at issue, CBP cannot even clear the first step of the two-step analysis—that is, show that disclosure "would compromise a substantial, as opposed to a de minimis, privacy interest."  AILA, 830 F.3d at 674 (internal quotation marks omitted); see Tower Cross-Mot. & Opp'n at 12 n.15.  True, the standard is not particularly demanding: a substantial privacy interest is "anything greater than a de minimis privacy interest."  Multi Ag Media LLC v. Dep't of Agric., 515 F.3d 1224, 1229–30 (D.C. Cir. 2008).  But where this standard is not met, FOIA requires disclosure regardless of any balancing against the public interest.  Id. at 1229; see also, e.g., AILA, 830 F.3d at 673–74; Bloomgarden v. Nat'l Archives & Recs. Admin., 798 F. App'x 674, 676 (D.C. Cir. 2020) (unpublished).

Even assuming—favorably to CBP—that Holland's privacy interest clears the "substantial" threshold, this interest would be outweighed by the public interest in disclosure of the requested records.  See AILA, 830 F.3d at 673–74.  To be sure, Tower appears to seek the records largely in relation to his personal dispute with NTEU and CBP regarding the continued

deduction of union fees from his wages. But this personal motivation is largely irrelevant to the public interest analysis, which focuses on whether the requested records shed light on "what the[] government is up to." Prison Legal News, 787 F.3d at 1147 (internal quotation marks omitted). The Court agrees with Tower that the public has an interest in understanding how CBP interacts with its employees' union—and particularly why CBP allegedly continued deducting union dues after one of its employees resigned his union membership. See Tower Reply at 7–8 (arguing, inter alia, that disclosure would "shed light on CBP's performance of its statutory duty not to interfere with an employee in the exercise of his right to refrain from labor union activity").[5] And the Court concludes that this public interest outweighs the privacy interest at issue—which, as discussed above, is quite weak.

Hence, disclosure of the fact that Holland is a CBP officer would not "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and Exemption 6—the basis for CBP's Glomar response—does not apply. CBP's Glomar response was therefore improper.

This does not necessarily mean that CBP must produce the requested records in full. "A court's rejection of an agency's Glomar response does not mandate subsequent disclosure of the records themselves, but requires the agency to process the records in the usual manner required by FOIA; the agency must inform the requester of the number of records and either release the records or justify its withholding pursuant to FOIA's exemptions." Smith v. CIA, 246 F. Supp. 3d 28, 31–

---

[5] CBP invokes U.S. Department of Defense v. Federal Labor Relations Authority, 510 U.S. 487 (1994). See CBP Opp'n & Reply at 8. But CBP does not offer much affirmative argument as to that case's relevance, and the Court struggles to discern any. The case involved a FOIA request brought by unions to obtain federal employees' home addresses. 510 U.S. at 489. The Supreme Court reasoned, in relevant part, that the "public interest supporting disclosure" was "negligible" because "[d]isclosure of the addresses might allow the unions to communicate more effectively with employees, but it would not appreciably further the citizens' right to be informed about what their government is up to." Id. at 497 (internal quotation marks omitted). Put differently, "such disclosure would reveal little or nothing about the employing agencies or their activities." Id. (emphasis added). That is not true here, where Tower seeks records bearing on his "employing agenc[y's] . . . activities" and its interaction with his former union.

32 (D.D.C. 2017); see also Heritage Found. v. U.S. Dep't of Just., Civ. A. No. 23-1148 (JEB), 2024 WL 1856418, at *14 (D.D.C. Apr. 29, 2024).

## II.     Other Issues

The only question before the Court bearing on Tower's entitlement to the requested records is the propriety of CBP's Glomar response, discussed above. Yet the parties devote a significant portion of their briefing to other issues. Tower seeks summary judgment on (1) his claims that CBP violated FOIA and its own Privacy Act regulations by failing to timely respond to his initial request (Counts One and Two) and (2) his claim that CBP wrongfully withheld documents, apparently on the grounds that CBP has withdrawn its reliance on Exemption 7(C) as a basis for withholding (Count Four). See Cross-Mot. & Opp'n at 6–7; Tower Reply at 1–4. CBP maintains that these claims are all moot—but, in the same breath, argues for summary judgment on the substantive Privacy Act claim that Tower withdrew (Count Five). See CBP Opp'n & Reply at 16–20. As best the Court can tell, all these arguments have little to do with Tower's access to records and much to do with positioning the parties for hypothetical fee proceedings. Indeed, Tower explicitly frames many of his arguments in these terms. See, e.g., Tower Reply at 2–3.

The Court begins with Tower's timeliness claims. Agencies must generally respond to a FOIA request within twenty business days, see 5 U.S.C. § 552(a)(6), and Privacy Act requests to CBP are subject to the same timeline, see 6 C.F.R. § 5.23(c). These requirements do not appear to have been met here: Tower submitted his records request on November 7, 2022, but CBP did not respond until March 1, 2023. See CBP Resp. ¶ 9; FOIA Resp. at 1.[6] But CBP did respond— and so contends that any dispute over the timing of this response is now moot. The Court agrees. Once an agency has responded to a records request, "the timeliness of that determination is no

---

[6] Indeed, CBP did not specifically respond to the Privacy Act portion of the request until November 28, 2023. Ex. C to Mot.

longer a live controversy fit for judicial review." Muttitt v. Dep't of State, 926 F. Supp. 2d 284, 296 (D.D.C. 2013); see also, e.g., Atkins v. DOJ, 946 F.2d 1563, 1563 (D.C. Cir. 1991) (per curiam) (unpublished) ("The question whether [the agency] complied with [FOIA's] time limitations in responding to [the] request is moot because [the agency] has now responded to this request."); Citizens for Resp. & Ethics in Washington v. FEC, 839 F. Supp. 2d 17, 24 (D.D.C. 2011) (similar), rev'd on other grounds, 711 F.3d 180 (D.C. Cir. 2013); Jud. Watch v. Rossotti, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (similar); Landmark Legal Found. v. EPA, 272 F. Supp. 2d 59, 68 (D.D.C. 2003) (similar).[7]  Hence, the Court will deny Tower's motion for summary judgment as to his timeliness claims.

Any disputes related to Exemption 7(C), on which CBP no longer relies, or Tower's withdrawn Privacy Act claim also appear to be moot.  "Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinion[s] advising what the law would be upon a hypothetical state of facts."  Chafin v. Chafin, 568 U.S. 165, 172 (2013) (alteration in original; internal quotation marks omitted).  Courts routinely conclude that withdrawn claims and arguments are moot.  See, e.g., Arave v. Hoffman, 552 U.S. 117, 118 (2008). Hence, the Court will not grant judgment to either party at this time.  The parties are free to renew their arguments to the extent these issues resurface or are relevant for any eventual fee proceedings.

## Conclusion

For the foregoing reasons, the Court will deny CBP's motion in full, grant Tower's cross-motion insofar as it challenges the propriety of CBP's Glomar response but otherwise deny it, and

---

[7] Tower's reliance on Tijerina v. Walters, 821 F.2d 789 (D.C. Cir. 1987), is misplaced.  The Tijerina court reasoned that an agency's release of "all nonexempt materials" rendered the plaintiffs' FOIA claims moot because the court "ha[d] no further judicial function to perform." Id. at 799 (internal quotation marks omitted).  The court did not, as Tower contends, hold that all FOIA claims—including timeliness claims—"only" become moot when an agency has produced all nonexempt material.  Tower Reply at 1.

15

direct CBP to process the requested records in line with FOIA's standard procedures. An accompanying Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: August 28, 2024